# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON                )
                                   )   DIVISION ONE
          Respondent,              )
                                   )   No. 77930-3-I
     v.                            )
                                   )   UNPUBLISHED OPINION
ROBERT LEE PRY, ROBERT             )
LAVALLE DAVIS, and ARNOLD          )
MAFNAS CRUZ,                       )
                                   )   FILED: November 13, 2018
          Appellants.             )
                                   )

DWYER, J. —This opinion resolves the consolidated appeals of Robert Lee Pry, Robert Lavalle Davis, and Arnold Mafnas Cruz, arising out of their joint trial in connection with the 2015 home invasion robbery and murder of Robert Archie Hood and resultant attempts to dispose of Hood's body.

Pry was charged with robbery, murder, and kidnapping, all in the first degree, with all crimes aggravated by the victim's particular vulnerability, the deliberate cruelty inflicted on the victim, and Pry's egregious lack of remorse. Pry was also charged with identity theft and possession of stolen property, both in the second degree, and witness tampering. All of these charges, save the witness tampering charge, were based on his central role in the commission of the home invasion and murder; the witness tampering charge was based on his conduct while in custody. Pry was found guilty as charged.

On appeal, through counsel, Pry assigns error to the trial court's denial of his motion for substitution of counsel, to the trial court's handling of an allegation of juror misconduct, to the prosecutor's statements in closing argument that, Pry claims, implied that he had tailored his testimony, and to that which Pry asserts were improper appeals to the jury's passion in the State's opening statement and closing argument. Pro se, Pry sets forth additional assignments of error in a statement of additional grounds for review. None of these claims of error warrant appellate relief.

Davis was charged with murder and robbery, both in the first degree, and both aggravated by the victim's particular vulnerability and Davis's multiple current offenses. Davis was acquitted on these charges. He was also charged with identity theft in the second degree, aggravated by his multiple current offenses, based on his asserted role in facilitating the home invasion and in later efforts to access Hood's bank accounts. He was found guilty on this charge. On appeal, through counsel, Davis claims that he was denied a fair trial due to: (1) prosecutorial misconduct, (2) ineffective assistance of his counsel in addressing this claimed misconduct; and (3) ineffective assistance of counsel in cross-examining a witness. Moreover, Davis avers, if none of these claims of error alone warrants reversal, their cumulative effect must. Pro se, Davis sets forth several assignments of error in a statement of additional grounds for review. None of the claims of error made on Davis's behalf entitle him to appellate relief.

Cruz was charged with rendering criminal assistance in the first degree, a class B felony, aggravated by his egregious lack of remorse and by the crime's

impact on others. He was also charged with concealment of a deceased body, a gross misdemeanor. Cruz was found guilty as charged, although the jury declined to find egregious lack of remorse as an aggravating factor. On appeal, Cruz avers that the information charging him with the felony was constitutionally deficient and that the exceptional sentence imposed on him was not authorized by statute. Pro se, Cruz submits a statement of additional grounds for review. We hold that the information charging Cruz with rendering criminal assistance in the first degree was constitutionally deficient. Consequently, we reverse this conviction with direction that the charge be dismissed by the trial court without prejudice. His misdemeanor conviction is undisturbed by this resolution. We remand Cruz's case to the trial court for resentencing.

For clarity, we will separately address each defendant's assignments of error and the facts pertinent thereto.

I

## Pry Appeal

A

On December 17, 2015, Robert Archie Hood was robbed, severely beaten, and killed in his home near Bremerton. Pry's girlfriend, Ocean Wilson, and Pry's sister, Shawna Dudley-Pry, were riding in the car transporting Pry and another man, Joshua Rodgers-Jones, to rob Hood's house.

Wilson testified that, later, Pry told her:

> [T]hat . . . they went up to the man's house, that he knocked on the door and told the man that he was God. And that they had tied the old man up and hit him and asked him if he had raped kids in the past. And I guess the old man, Mr. Hood, had confirmed that that

was a long time ago. [Pry] told me that they left the man in the house tied up, and he was snoring on the floor.

That night, Wilson, Pry and Dudley-Pry stayed in a motel room where they attempted to access Hood's bank accounts via telephone calls and the Internet. Pry and the others left the motel and returned to Bremerton the next day.

On December 21, Hood's friend Candyce Gratton went to his house, noticed that he was gone and that the house was in disarray, and alerted the police. On December 22, Pry was taken into custody. A subsequent police search of the duplex in which Pry had been living revealed many of Hood's personal effects and various documents containing his financial information. Hood's body was recovered on December 30.

The State brought charges against Pry, Davis, Cruz, and Rodgers-Jones and joined their cases for trial. The trial court later severed Rodgers-Jones's case for trial. The consolidated trial consumed 44 days.

On the first day of jury selection, a day on which 200 jurors had been summoned to court, Pry requested a new appointed attorney. His stated basis was that he did not "feel . . . adequately represented" and that his attorney was trying to get him "to take a [plea] deal [rather] than preparing for my defense." Pry's attorney then stated that he had no issue with continuing to represent Pry. The trial court denied the request. Pry did not make any request of this nature at any other time during the trial.

In opening statement, the prosecutor opined that Hood "probably never envisioned" the events leading to his death, a remark to which no defense counsel objected.

-4-

Twice during trial, attorneys for Pry and for Davis brought to the court's attention a juror who appeared to them to have been asleep during trial. When Davis's attorney first called the judge's attention to the juror in question, the judge stated that the juror did not appear to him to have been asleep during the proceedings. Later, attorneys for both Pry and Davis again raised the issue. The trial court, after hearing observations and argument from counsel and reciting its own observations of the juror's behavior, made a factual finding that the juror had not been sleeping. Pry and Davis subsequently declined the judge's offer of further inquiry. Neither raised the issue again.

During the State's cross-examination of Pry, in response to a question about his memory of specific dates in December 2015, Pry stated, "[M]y life is on the line and I've had plenty of time to think about everything that's happened thoroughly." In closing argument, the prosecutor referenced this remark in order to cast doubt on Pry's credibility as a witness and to imply that Pry's having "had plenty of time to think about everything that's happened" meant that he had used that time to conform or tailor his testimony to the evidence produced at trial.

The prosecutor also noted, in closing argument, that the evidence did not show the exact course of events that took place when Pry and Rodgers-Jones were alone with Hood, but that the evidence established more than sufficient facts about Hood's death to prove the State's case. The prosecutor also noted that the day on which the closing argument was delivered would have been Hood's birthday, and asked the jury to "celebrate" Hood by carefully considering the evidence. An objection was interposed to the use of the word "celebrate."

This objection was sustained and no defendant requested any further relief. No objections were interposed to the other remarks.

The jury found Pry guilty of murder, robbery, and kidnapping, all in the first degree. It further found that all of the offenses were aggravated by the victim's particular vulnerability, the deliberate cruelty inflicted on the victim, and Pry's lack of remorse. Pry's convictions for murder and robbery in the first degree were subsequently merged into a single felony murder conviction. The jury also found Pry guilty of identity theft in the second degree, possession of stolen property in the second degree, and witness tampering. The court imposed an exceptional sentence of 958 months of imprisonment.

B

Pry first contends that the trial court's denial of his request for substitution of appointed counsel, made on the first day of jury selection, constituted an abuse of its discretion. We disagree.

While the Sixth Amendment to the United States Constitution guarantees that, in "all criminal prosecutions, the accused shall . . . have the assistance of counsel for his defense," it does not give an indigent defendant an absolute right to choose any particular advocate. U.S. CONST. amend VI; State v. Stenson, 132 Wn.2d 668, 733, 940 P.2d 1239 (1997).[1] Whether an indigent defendant's dissatisfaction with his court-appointed counsel justifies the appointment of new

_____

[1] The analysis is the same under the state constitution. State v. DeWeese, 117 Wn.2d 369, 375-76, 816 P.2d 1 (1991).

counsel is a matter reserved to the trial court's discretion.[2] Stenson, 132 Wn.2d at 733. The timeliness of a request for substitution of counsel affects the trial court's exercise of discretion to grant or deny that request. State v. Garcia, 92 Wn.2d 647, 655-56, 600 P.2d 1010 (1979).

> A criminal defendant who is dissatisfied with appointed counsel must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant. Smith v. Lockhart, 923 F.2d 1314, 1320 (8th Cir. 1991). Attorney-client conflicts justify the grant of a substitution motion only when counsel and defendant are so at odds as to prevent presentation of an adequate defense. E.g., State v. Lopez, 79 Wn. App. 755, 766, 904 P.2d 1179 (1995) (citing United States v. Morrison, 946 F.2d 484, 498 (7th Cir. 1991)). The general loss of confidence or trust alone is not sufficient to substitute new counsel. Johnston v. Florida, 497 So.2d 863 (Fla. 1986).
>
> Factors to be considered in a decision to grant or deny a motion to substitute counsel are (1) the reasons given for the dissatisfaction, (2) the court's own evaluation of counsel, and (3) the effect of any substitution upon the scheduled proceedings. State v. Stark, 48 Wn. App. 245, 253, 738 P.2d 684 (1987).

Stenson, 132 Wn.2d at 734.

The analogous situation of a request to proceed pro se provides the rule applied in this setting, as regards the timeliness of the request:

> (a) if made well before the trial or hearing and unaccompanied by a motion for continuance, the right of self-representation exists as a matter of law; (b) if made as the trial or hearing is about to commence, or shortly before, the existence of the right depends on the facts of the particular case with a measure of discretion reposing in the trial court in the matter; and (c) if made during the trial or hearing, the right to proceed pro se rests largely in the informed discretion of the trial court.

---

[2] A trial court abuses its discretion when its decision adopts a view no reasonable person would take or is based on untenable grounds or untenable reasons. State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012).

State v. Fritz, 21 Wn. App. 354, 361, 585 P.2d 173 (1978).

Our courts have been alert to the risk of defendants using requests for substitute counsel to hinder or delay proceedings. State v. DeWeese, 117 Wn.2d 369, 379, 816 P.2d 1 (1991). "In the absence of substantial reasons a late request should generally be denied, especially if the granting of such a request may result in delay of the trial." Garcia, 92 Wn.2d at 656 (analyzing a late request to proceed pro se). Indeed, the basic rule is plainly stated: "A defendant may not manipulate the right to counsel for the purpose of delaying and disrupting trial." DeWeese, 117 Wn.2d at 379.

"[A] trial court conducts adequate inquiry by allowing the defendant and counsel to express their concerns fully"; this process need not be a formal inquiry. State v. Schaller, 143 Wn. App. 258, 271, 177 P.3d 1139 (2007). The defendant must state the reasons for his dissatisfaction with counsel and the record on appeal should show that the trial court had before it the information necessary to assess the merits of the defendant's request. State v. Varga, 151 Wn.2d 179, 200-01, 86 P.3d 139 (2004).

This trial involved three defendants. Sixty-eight witnesses were called to testify. Two hundred jurors were summoned on the first day of voir dire. Scheduling was already a major concern for witnesses, jurors, and counsel. It was in this context that Pry made the request for substitution of counsel without providing any substantial reasons therefor. Granting Pry's request would have forced either a continuance of the proceedings or a severance of Pry's case from the other defendants' cases.

And a severance was no small matter. The trial judge had already ruled on severance requests from the various defendants. It had granted Rodgers-Jones's request and denied the others. The trial judge had good reason to take care that Pry's request for new counsel did not become a disguised attempt to obtain the severance that the court had previously denied him.

Further, Pry's vague statements to the trial court contained no contention of a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between Pry and his counsel. At no other point in the months-long period before trial, nor during the remaining weeks of trial, did Pry state that there was any issue between himself and his attorney. Indeed, Pry's counsel had made 16 separate appearances on Pry's behalf before the trial judge prior to Pry making his request. Based on the trial court's observations of counsel's advocacy for Pry during each appearance before the trial court, the court acted within its discretion in accepting his assertion that he had no concerns about moving forward as Pry's attorney.

Pry claims that the trial court did not make a sufficient inquiry into his request. In fact, the judge asked Pry why he was dissatisfied and asked his counsel if he had any concerns. As noted above, the record fails to show any inadequacy on the part of Pry's counsel and Pry described only a general dissatisfaction with his representation. The inquiry was sufficient to fully inform the judge, who was plainly aware of a continuance's impact "upon the scheduled proceedings." Stenson, 132 Wn.2d at 734. The trial court did not abuse its

discretion in denying Pry's late request for new appointed counsel. Fritz, 21 Wn. App. at 361. There was no error.

C

Pry next avers that a juror may have been sleeping during the trial, and that the trial court abused its discretion by not properly investigating this juror's alleged misconduct. To the contrary, the record does not show that the juror was sleeping, and no defendant accepted the trial court's offer for further inquiry when the issue was addressed at trial. Thus, the trial court did not abuse its discretion. There was no error.

RCW 2.36.110 and CrR 6.5 impose on the trial court a continuous obligation to investigate allegations of juror unfitness and to excuse jurors who are found to be unfit. State v. Elmore, 155 Wn.2d 758, 773, 123 P.3d 72 (2005). The party alleging juror misconduct bears the burden of showing that such misconduct occurred. State v. Reynoldson, 168 Wn. App. 543, 547, 277 P.3d 700 (2012). RCW 2.36.110 sets forth the circumstances under which a trial court must dismiss a juror:

> It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

For dismissal to be proper, the record must establish that a juror engaged in "misconduct." State v. Jorden, 103 Wn. App. 221, 229, 11 P.3d 866 (2000). In resolving an allegation of juror misconduct, the trial court may act as both an observer and a decision-maker, and its factual determinations are given

-10-

deference on appeal. Elmore, 155 Wn.2d at 768-69; Jorden, 103 Wn. App. at 229. The trial court's determination is reviewed for an abuse of discretion. There is no mandatory format for a trial court to utilize when determining whether a juror engaged in misconduct. The trial court has discretion to hear and resolve the issue in any manner that avoids tainting the juror and that works best for the proceedings. Jorden, 103 Wn. App. at 229.

It is not always necessary for a trial judge to engage in further inquiry in response to an allegation of a sleeping juror because the judge may be personally aware of whether the juror was (or was not) sleeping. In Jorden, the judge observed the allegedly sleeping juror during trial and found that "she was yawning, dozing, and sitting with her eyes closed." 103 Wn. App. at 226. The juror was dismissed after the judge concluded that she was "'the most inattentive juror [the judge had] seen in six and a half years of doing trials.'" Jorden, 103 Wn. App. at 226.

In this case, the trial court was confronted, twice, with a defense contention that the challenged juror had been sleeping. The prosecutor disagreed. In the first instance, the trial court resolved the matter with the judge's affirmative statement that the juror had not been asleep during the proceedings.[3] Over a month later, when the issue was brought to the trial court's attention during closing arguments, the prosecutor stated:

___

[3] The issue was brought to the court's attention during a break in the proceedings when Davis's lawyer stated that the juror "looks like he might be dozing a little bit." The judge observed that the juror was attentive but may have had a headache; the prosecutor corroborated this account, stating that the juror had manifested frustration with the pace of the proceedings. The judge did not accept that the juror had been sleeping, remarking that "[i]t is just when we were on the break there he had his eyes closed."

> I'm watching him keep notes. He doesn't look at the speaker in the eye the entire time, but he's taking notes throughout [the defense] argument[s] .... He's not sleeping.

To this the trial court added its own observation:

> I've watched him because he does have that appearance on occasion. And so I paid special attention to him during those occasions. I haven't noticed anything where he looks like he's actually asleep.

Pry and Davis both declined the trial court's offer for further inquiry into the matter. Cruz did not express any opinion on the matter. Hence, the record is that the trial court investigated the allegation and made a finding of fact—that the juror was not "actually asleep." Further, in declining the trial court's offer to make further inquiry of the matter, the defendants waived any claim that the trial court's process for resolving the issue was insufficient. The trial court did not abuse its discretion in its disposition of the juror misconduct allegation. There was no error.

D

Pry next avers that the prosecutor, in her closing argument, improperly accused him of tailoring his testimony based only on his presence in the courtroom. This mischaracterizes the prosecutor's argument, in which the prosecutor quoted Pry's own testimony to show that he had time to think about what he would say when testifying. This assertion was not misconduct.

In support of his argument, Pry cites to Justice Ginsburg's dissent in Portuondo v. Agard, 529 U.S. 61, 120 S. Ct. 1119, 146 L. Ed. 47 (2000). The majority opinion in Portuondo held that a defendant's rights under the Sixth Amendment to the United States Constitution were not violated when a

-12-

prosecutor's closing argument called attention to the fact that the defendant had possessed the opportunity to hear the other trial witnesses testify and to tailor his testimony accordingly. Portuondo, 529 U.S. at 73. Justice Ginsburg was of the view that this "transform[ed] a defendant's presence at trial from a Sixth Amendment right into an automatic burden on his credibility." Portuondo, 529 U.S. at 76 (Ginsburg, J., dissenting).

Our Supreme Court adopted Justice Ginsburg's views when it analyzed a similar accusation of tailoring under the pertinent provision of the state constitution. State v. Martin, 171 Wn.2d 521, 533-36, 252 P.3d 872 (2011) (holding that, in this circumstance, Const. art. I, § 22 provides greater rights than does the Sixth Amendment). Soon thereafter, in State v. Hilton, 164 Wn. App. 81, 261 P.3d 683 (2011), a panel of Division Three judges resolved an appeal in a case in which the prosecutor had made a more direct tailoring argument—one that specifically referenced the defendant's presence in court. The appellate court nevertheless rejected the defendant's assertion of prosecutorial misconduct because the prosecutor's argument was based on the defendant's testimony, not on his mere presence. The court explained:

> As noted previously, the Martin majority did not address the issue, which had divided the court in Portuondo, of whether a generic tailoring argument would be proper. 171 Wn.2d at 536 n.8. This case does not truly present that issue, either, since the defendant was cross-examined about tailoring and the prosecutor's argument directly tied the credibility of defendant's testimony to his opportunity to prepare it. This was not a generic tailoring argument because it had a basis in the cross-examination. There was nothing improper about the argument because it was reasonably drawn from the testimony admitted at trial. Hoffman, 116 Wn.2d at 95.

-13-

> It was proper to cross-examine the defendant about the changes in his story and his opportunities to prepare those changes. It was thus also proper to argue the issue to the jury. 116 Wn.2d at 95. The defendant's constitutional rights under article I, section 22 were not violated.

Hilton, 164 Wn. App. at 98 (citing State v. Hoffman, 116 Wn.2d 51, 804 P.2d 577 (1991)).

In this case, the prosecutor's comments in closing argument did not accuse Pry of tailoring his testimony based on his mere presence at trial. Rather, the comments were based on inferences that the prosecutor drew from Pry's own testimony, as was found acceptable in Hilton. In her closing argument, the prosecutor discussed Pry's actions and testimony to demonstrate his instinct for self-preservation, and then made the comment that is the subject of Pry's misconduct argument:

> So these are Robert Pry's words to you when he took the stand. He told you that he would not divulge information freely. He is not a credible witness in this case.
>
> These are his words. "My life is on the line, and I've had plenty of time to think about what happened." He is able to craft his statement to you in court.

Pry objected to this, citing to Martin. The trial court overruled his objection, explaining that the comment was not an accusation of tailoring based on Pry's mere presence in court but, instead, that "[the prosecutor] said . . . he had a lot of time to think about it and put a story together, essentially, which is what he said." The prosecutor's comments, and the trial court's ruling, are supported by the record of Pry's cross-examination. Pry's assertion of misconduct thus fails.

-14-

E

Pry also asserts that the prosecutor's opening statement and closing argument contained improper appeals to the jury's passion.

In her opening statement, the prosecutor stated that Hood "probably never envisioned" the manner of his death. In her closing argument, the prosecutor noted that the day would have been Robert Hood's 90th birthday had he lived, that the evidence did not indicate precisely what happened when he was beaten and hog-tied, and that the jury should "celebrate" Hood. Of these comments, only the last was objected to by defense counsel. On appeal, Pry avers that the comments, taken as a whole, were so improper that they had a cumulative effect of prejudicial error, and that this effect was so pronounced that no instruction or series of instructions could ameliorate it and cure the error. We do not agree that the challenged statements constituted misconduct that would entitle Pry to a new trial.

A defendant alleging improper argument by the State bears the burden of proving that the prosecutor's conduct was both improper and prejudicial. State v. Emery, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Once a defendant establishes that a prosecutor's statements were improper, the appellate court determines whether the defendant is entitled to relief by applying one of two standards of review. Emery, 174 Wn.2d at 760. The first standard, which applies if the defendant timely objected at trial and the objection was overruled, requires that the defendant show that the prosecutor's misconduct led to prejudice that had a substantial likelihood of affecting the jury's verdict. Emery,

174 Wn.2d at 760. However, if the objection was sustained and no further remedy was requested, any claim that the trial judge should have imposed a further remedy is forfeited. See State v. Giles, 196 Wn. App. 745, 769, 385 P.3d 204 (2016) (when a party receives the remedies he requested, "[t]he law presumes that these remedies are effective").[4]

The second standard applies if the defendant did not object at trial. In that event, the defendant is deemed to have waived the claim of error unless the defendant can show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" Emery, 174 Wn.2d at 761 (quoting State v. Thorgerson, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)).

Pry relies on State v. Pierce, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012), in which the defendant assigned "error to three examples of the prosecutor appealing to the jury's passion and prejudice and arguing facts outside the evidence: (1) the prosecutor's first person narrative of the thoughts [the defendant] must have been thinking leading up to the crimes, (2) the prosecutor's fabricated description of the murders, and (3) the prosecutor's argument that the [victims] could not have imagined they would be murdered in their own home." In Pierce, the prosecutor "told the jury an emotionally charged, but largely speculative," narrative of the alleged crime. 169 Wn. App. at 542.

> [Pat Yar] probably said, "This ain't over. I know you. This ain't
> over." Okay? I betcha he was hot. Makes these two people lay
> down on their floor, in their home, in their kitchen, almost head-to-

---

[4] "It is a principle of long standing that a trial attorney who does not request a remedy forfeits the claim that the trial judge should have imposed that remedy." Giles, 196 Wn. App. at 769-70.

head, face-to-face where they can see each other. Where they look into their eyes. They can look into their eyes. "I can't leave any witnesses, especially one that'll probably kill me the next time he sees me." And he shoots. There's your premeditation. "Lay down on the floor. Say your goodbye's."

Pierce, 169 Wn. App. at 543.

Further, the prosecutor in Pierce stated that "'[n]ever in their wildest dreams . . . . or in their wildest nightmare'" could the victims have expected to be murdered on the day of the crime. 169 Wn. App. at 555. The court in Pierce held that this argument was an improper invitation for the jury to place themselves in the proverbial shoes of the victims, and that the victims' lack of expectations that the crime would occur was not relevant to the defendant's guilt. 169 Wn. App. at 555.

Pry also cites to State v. Claflin, 38 Wn. App. 847, 690 P.2d 1186 (1984), as an example of a prosecutor's undue appeal to the jury's sympathy for a victim. In Claflin, the prosecutor recited a lengthy "poem utilizing vivid and highly inflammatory imagery in describing rape's emotional effect on its victims." 38 Wn. App. at 850. The court in Claflin noted that "reference to the heinous nature of a crime and its effect on the victim can be proper argument," but that reciting the poem "was nothing but an appeal to the jury's passion and prejudice" that "contained many prejudicial allusions to matters outside the actual evidence." 38 Wn. App. at 849-51.

In the State's opening statement herein, the prosecutor offered that "[Mr. Hood] probably never envisioned that when he opened the door that night that he would be beaten so severely that he would be left paralyzed, that he would then

be hog-tied and left to die on his bathroom floor."[5] Pry analogizes this statement to the "never in their wildest dreams" statement in Pierce. 169 Wn. App. at 555. Here, however, the prosecutor's language was more tempered than either that used in Pierce or that which Pry's brief alleges. Significantly, the prosecutor qualified her statement with the word "probably." Moreover, as Pry did not object, our inquiry considers whether the allegedly improper statement was so flagrant and ill-intentioned that any resulting prejudice could not have been remedied by a curative instruction. The language used here is not comparable to the inflammatory statement in Pierce and, even if the statement were improper, we are confident that any resulting prejudice could have been cured by a proper instruction.

Pry also asserts that, in the State's closing argument, the prosecutor "fabricated a description" of the attack on Hood comparable to that set out in Pierce. In his brief, Pry quotes the prosecutor's opening passage from this argument while omitting the sentences in which she tied her comments to the available evidence. The full passage in question is as follows:

> [W]e are here talking about the violence that was done to his body. The violence that was done to his body after he was killed. We are here talking about the night of terror that was issued upon him on December 17th. When Joshua Rodgers Jones and Robert Pry go to his house, knock on the door and say, "It's God."
>
> Now, Robert Hood knew Rodgers Jones, likely trusted Rodgers Jones. There was no signs of a forced entry. I don't know if the door was unlocked or if he let them in.

---

[5] In Pry's brief, Pry asserts that the prosecutor stated, in her opening statement, "Mr. Hood could not have imagined that he would be beaten so severely that he would be left paralyzed, then hog-tied, and left to die on his bathroom floor." The record shows that the prosecutor actually stated that Hood "probably never envisioned" these events.

I don't know what happened in those first moments, whether or not they started in on him right away or whether or not they sat and chatted with him first. Whether Rodgers Jones introduced Archie to Robert Pry. Or whether they started torturing him right away. Whether they started shouting at him and hitting him, demanding his account numbers, his PIN numbers, his cash, his firearms. I can't answer those questions for you.

And I don't have to answer those questions for you. We do know from Dr. Lacsina, the medical examiner, that he was beaten. We know that he was beaten severely around the head. We saw those horrible pictures. We know that he had a broken nose, that he had swollen, blackened eyes. We know that he had defensive wounds on his hands. Extensive bleeding on the brain under his subarachnoid, on his skull, he had bleeding.

We know that he was beaten after he was tied. We know he was still alive when he was bound by the hands. We can only hope that by the time he was hit so hard that he was paralyzed that he was rendered unconscious. We can only hope that when he was dragged into the bathroom and hogtied and left to die on the bathroom floor, that he was unconscious.

Pry omits the third paragraph of this passage from his brief. However, with the benefit of the context provided by the omitted passage, it is clear that the prosecutor did not fabricate a narrative comparable to that which took place in Pierce. To the contrary, the prosecutor stated that the evidence did not show the exact course of events during the home invasion, but pointed out that this was not necessary in order for the State to prove its case because of that which the evidence did establish.

Pry also argues that two sentences quoted above beginning with "We can only hope . . ." were an undue appeal to sympathy for Hood, comparable to the language used by the prosecutor in Claflin. We disagree. The prosecutor herein was primarily referring to the evidence presented at trial and stated explicitly which facts had been and which facts had not been established by the evidence.

Indeed, the evidence well-supported the prosecutor's statements that "[Hood] was hit so hard that he was paralyzed" and that "he was dragged into the bathroom and hogtied and left to die on the bathroom floor." Nothing in the prosecutor's statement can be properly likened to the poetry recited in Claflin.

All of the comments made by the prosecutor in closing to which Pry did not object, but now cites to support his claim of misconduct, were but small fragments of a lengthy closing argument. Comparing them, in context, to the arguments advanced in the cases Pry cites, they are measured statements. They are not shown to have been flagrant and ill-intentioned. It is not established that proper jury instructions could not have cured any prejudice resulting from these statements. Indeed, it is not apparent that any prejudice resulted from the statements at all. In fact, after closing arguments were delivered, the jury took five days to examine the evidence, did not vote to convict Davis on several of the State's charges, and declined to find one of the aggravating circumstances with which Cruz had been charged. These are not the actions of a jury stirred to decide a case based on its passions rather than the evidence produced at trial.

The prosecutor also stated that the jury should "celebrate" Hood. Pry objected to this comment. The trial court sustained the objection. Thereafter, none of the defendants requested any further relief. Pry received the remedy he requested regarding the "celebrate" remark. The law presumes this remedy to be effective. Giles, 196 Wn. App. at 769 (citing State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008); State v. Swan, 114 Wn.2d 613, 661-64, 790 P.2d 610 (1990)). Thus, Pry's contention that the prosecutor's statements, taken together,

constituted misconduct that denied him a fair trial is unavailing. He does not establish an entitlement to appellate relief.

F

Pry, pro se, seeks relief in a statement of additional grounds filed pursuant to RAP 10.10. None of these grounds merit appellate relief.

Pry first asserts that the trial court erred by admitting hearsay statements under hearsay exceptions that he contends were inapplicable. However, he provides no argument or authority as to how these statements failed to conform to exceptions to the hearsay rule. Thus, he does not establish trial court error.

Pry next contends that his sentence violated the constitutional prohibition on double jeopardy. He avers that, although his robbery and felony murder convictions were merged at the entry of judgment into the felony murder conviction, his kidnapping conviction should also have been merged into the felony murder conviction. Again, he provides no support for his contention. Pry cites to State v. Williams, 131 Wn. App. 488, 128 P.3d 98 (2006), but that case only concerns the merger of felony murder and robbery convictions into the felony murder conviction—exactly as happened herein.

"If the legislature authorizes cumulative punishments for both offenses, double jeopardy is not offended." State v. Moreno, 132 Wn. App. 663, 667, 132 P.3d 1137 (2006). "Where a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense." In re Pers. Restraint of Orange, 152 Wn.2d 795, 815, 100 P.3d 291

(2004). Washington courts have consistently ruled that, consistent with legislative intent, "kidnapping and robbery never merge." State v. Berg, 181 Wn.2d 857, 866 n.3, 337 P.3d 310 (2014) (citing In re Personal Restraint of Fletcher, 113 Wn.2d 42, 52-53, 776 P.2d 114 (1989)). In arguing that the robbery and kidnapping convictions should have been merged, Pry is arguing against settled law. There was no error.

Finally, Pry assigns error to the court's imposition of an exceptional sentence. Specifically, he contends that the trial court's decision to increase his sentence based on a finding not included in the jury's verdicts was a violation of his right to a jury trial. Pry received an exceptional sentence pursuant to RCW 9.94A.535(2)(c), which gives the trial court discretion in imposing a sentence when a defendant has committed multiple current offenses and, due to the defendant's high offender score, the absence of an exceptional sentence would allow one or more crimes to go unpunished. Pry's case fit this scenario due to his plethora of prior convictions and current offenses. Contrary to Pry's assertions, the sentencing court is allowed to make findings of fact regarding the existence of prior convictions. Blakely v. Washington, 542 U.S. 296, 301, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004). Thus, the imposition of an exceptional sentence did not violate Pry's Sixth Amendment rights. This argument, as with the other arguments in Pry's statement of additional grounds, lacks merit. Pry's statement of additional grounds fails to establish a basis for appellate relief.

## II

## Davis Appeal

### A

Ocean Wilson testified that it was Robert Davis who drove Pry and Rodgers-Jones to Hood's house on December 17. The drop-off location identified by Wilson was under 24-hour video surveillance, although the quality of the surveillance footage was too poor to discern any cars stopping there. That evening, Davis met with Alisha Small, telling Small that he had heard that she was a "paper shark"—a person with good accounting skills—and that he had "a large account . . . he wanted [her] to work on."

Davis, Small, Wilson, Pry, Dudley-Pry, and Rodgers-Jones later headed for the Emerald Queen Casino in Fife. At the casino, Davis called his friend Donald Goodloe and asked him to come to the casino. Goodloe did so, accompanied by Sheila Costello. Using money provided by Davis, Goodloe rented a room at a motel across the street. Pry, Dudley-Pry, and Small all used the room to attempt to access Hood's bank accounts. Davis occupied his own room at the casino hotel. Late the next day, all except Costello returned to Bremerton.

Davis was arrested on December 22. He was eventually tried along with Pry and Cruz. Among the 68 testifying witnesses were Wilson, Goodloe, Davis's former roommate Christina Waggoner, and several detectives. During the prosecution's direct examination of Detective Ray Stroble, who had previously questioned Goodloe, evidence was introduced to the effect that Davis had

involved Costello to get her aid in helping access Hood's accounts. This evidence was admitted only to impeach Goodloe's testimony, and the jury was instructed that it was not to consider the evidence for any other purposes.

Waggoner testified for the State. During Davis's cross-examination of Waggoner, his counsel brought out the issue of Waggoner's poor relationship with her neighbors due to her connection with Davis. The trial court ruled that this opened the door, on re-direct examination, to testimony that Waggoner had been questioned by third parties regarding her loyalty to Davis. Davis's attorney unsuccessfully argued that the issues were not related.

In closing argument, the prosecutor referred to Davis's alleged recruitment of Costello to help access Hood's accounts. Davis's lawyer did not object.[6] In Davis's summation, his attorney noted to the jury that no substantive evidence supported the allegation that Davis had recruited Costello for this purpose.

Davis was acquitted on charges of murder in the first degree and robbery in the first degree. The jury found him guilty of identity theft in the second degree. Davis received an exceptional sentence of 103 months based on a plea bargain with the State.[7]

B

Davis first asserts that the prosecutor engaged in misconduct when, during closing argument, she referenced—for substantive purposes—evidence that had been admitted only for impeachment purposes. The challenged

---

[6] The state concedes that this was a misuse of impeachment evidence.

[7] Davis's plea bargain involved a guilty plea for an unrelated charge of felony promotion of prostitution. The plea bargain arrangement ran his sentence for this conviction consecutively to his sentence for the conviction herein.

statement was the prosecutor's reference to evidence that Davis brought Sheila Costello to Fife to help with accessing Hood's bank accounts.

The State concedes that this reference was improper but, nevertheless, argues that it does not warrant a new trial. We agree.

As previously discussed, claims of prosecutorial misconduct are reviewed under one of two standards. If the allegedly improper statement was objected to, the defendant must show that it led to prejudice that had a substantial likelihood of affecting the jury's verdict. Emery, 174 Wn.2d at 760. If no objection was interposed, the defendant must show that the misconduct was so grave that no curative instruction could have obviated its prejudicial effect on the jury, and that the misconduct was flagrant, ill-intentioned, and "resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" Emery, 174 Wn.2d at 761 (quoting Thorgerson, 172 Wn.2d at 455). In addressing the question of jury prejudice, the jury is presumed to follow its instructions. State v. Grisby, 97 Wn.2d 493, 499, 647 P.2d 6 (1982) (assessing prejudice from improper statement in argument to jury).

Davis did not object to the misuse of the impeachment evidence. Rather, he addressed the issue in his own closing argument. As there was no objection, we review the contention of misconduct under the more stringent standard. With the exception of the single utterance about Costello, the prosecutor made an argument as to Davis's involvement with the effort to access Hood's bank accounts that was fully supported by the substantive evidence. This includes the evidence that Davis recruited Small to assist with accessing Hood's accounts,

that he transported Small, Pry, and Wilson to the motel near the Emerald Queen

Casino (where they made attempts to access Hood's bank accounts), and that

he gave Don Goodloe money to rent the room at the motel in Goodloe's name.

Significantly, the jury was given the following instruction at the time that

the impeachment evidence was offered during trial:

> I'm going to allow the witness to answer the following questions, but you may consider the answers only for the purpose of judging the credibility of Donald Goodloe's testimony. The answers are not being admitted as substantive evidence and you may not consider the answers in your deliberations as proof of the matter asserted.

Prior to the attorneys' closing arguments and the jury commencing its

deliberations, the jury was also provided with the following instruction:

> One of my duties has been to rule on the admissibility of evidence. Do not be concerned during your deliberations about the reasons for my rulings on the evidence. If I have ruled that any evidence is inadmissible, or if I have asked you to disregard any evidence, then you must not discuss that evidence during your deliberations or consider it in reaching your verdict. Do not speculate whether the evidence would have favored one party or the other.

Jury Instruction 1. The jury was also instructed that:

> Certain evidence has been admitted in this case for only a limited purpose. This evidence may be considered by you only for that purpose. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

Jury Instruction 6.

Thus, it is plain that a curative instruction (the judge simply reminding the

jury of the judge's prior instructions) could have ameliorated any prejudice

caused by the passing misuse of the impeachment evidence. Moreover, nothing

-26-

supports the proposition that the misuse was flagrant or ill-intentioned. Davis's assertion of misconduct fails.

C

Davis next asserts that his attorney provided constitutionally deficient representation because his lawyer did not object to the prosecution's misuse of the impeachment evidence. We disagree.

Constitutionally ineffective assistance of counsel is established only when the defendant shows that (1) counsel's performance, when considered in light of all the circumstances, fell below an objectively reasonable standard of performance, and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 689-95, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Hassan, 151 Wn. App. 209, 217, 211 P.3d 441 (2009). The burden is on the defendant to demonstrate deficient representation and prejudice. In re Det. of Hatfield, 191 Wn. App. 378, 401, 362 P.3d 997 (2015). Failure to satisfy either part of this analysis ends the inquiry. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996).

"Because the presumption runs in favor of effective representation, the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." State v. McFarland, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995). "[T]he presumption of adequate representation is not overcome if there is any 'conceivable legitimate tactic' that

can explain counsel's performance." Hatfield, 191 Wn. App. at 402 (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)).

Furthermore, prejudice is only shown if "there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different." State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. There is a significant limitation applicable to the assessment of prejudice.

> In assessing prejudice, "a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to the law" and must "exclude the possibility of arbitrariness, whimsy, caprice, 'nullification' and the like."

State v. Grier, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011) (quoting Strickland, 466 U.S. at 694-95). As the Supreme Court explained in Strickland,

> A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed. The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.

466 U.S. at 695. This means that, in assessing potential prejudice, we must assume that the jury followed the court's instructions. Grier, 171 Wn.2d at 43-44.

As to the first part of the Strickland two-part test, Davis does not contend, let alone show, that there was no conceivable tactical reason for his counsel to refrain from objecting to the misuse of the impeachment evidence. To the contrary, the record makes clear that his attorney knew that the impeachment evidence could not be considered by the jury for substantive purposes and opted

not to object in favor of addressing the matter during Davis's closing argument. Put simply, rather than object during argument (and risk looking like an obstructionist to the jury), counsel chose to use part of her closing argument to rightfully accuse the prosecutor of trying to cheat to gain a conviction. This was a conceivable, and sound, tactical decision.

It is also true that Davis cannot show that he was prejudiced as a result of his lawyer's performance. As noted, the impeachment evidence in question was admitted along with a limiting instruction directing that the evidence could not be considered by the jury as substantive evidence. The jury, before both closing arguments and its deliberations, was again instructed to this effect. The jury is conclusively presumed to have followed these instructions. Strickland, 466 U.S. at 695; Grier, 171 Wn.2d at 43-44.

Because Davis is not entitled to rely on a lawless decision-maker to establish prejudice, he cannot do so. Assuming that the jury followed its instructions, as we must, there is no possibility that it considered the impeachment evidence as substantive evidence. As a matter of law, Davis cannot show prejudice.

### D

Davis next claims that he received ineffective assistance of counsel based on his lawyer's cross-examination of Christina Waggoner. Specifically, Davis faults his attorney for opening the door to testimony that Waggoner was under pressure not to testify against Davis. Davis, again, does not show that his counsel's assistance was ineffective.

The Strickland test, summarized above, requires Davis to prove both deficient performance and prejudice. Deficient performance is that which falls "below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Defense counsel's decisions on strategy or tactics in the course of representation are given deference on review and the threshold for proving deficient performance is high. "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688. "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." Kyllo, 166 Wn.2d at 863.

Here, Davis's attorney had a legitimate trial strategy behind her line of questioning while cross-examining Waggoner: she brought out the fact that Waggoner's neighbors were unhappy with her after Davis, a house guest of hers, was involved in Hood's robbery and murder. This would tend to show that Waggoner had a motive to testify against Davis. In this way, Davis's attorney sought to impeach Waggoner's testimony.

Davis's counsel made an obvious tactical decision. The adoption of such a tactic does not constitute deficient performance. Davis's ineffective assistance of counsel claim fails.

E

Based on the assignments of error discussed above, Davis next argues that he has a right to a new trial due to cumulative error. Cumulative error is established when, taken alone, several trial court errors do not warrant reversal

-30-

of a verdict but the combined effect of the errors denied the defendant a fair trial. State v. Hodges, 118 Wn. App. 668, 673-74, 77 P.3d 375 (2003). It is the defendant's burden to prove an accumulation of error of sufficient magnitude to necessitate retrial. In re Pers. Restraint of Lord, 123 Wn.2d 296, 332, 868 P.2d 835, 870 P.2d 964 (1994). Davis makes this assertion without support. He has not established any prejudicial error, let alone the many errors that would give rise to a ruling of cumulative error. His claim fails.

F

Davis, pro se, seeks relief in a statement of additional grounds pursuant to RAP 10.10.[8] None of his contentions therein establish a basis for appellate relief.

As did Pry, Davis alleges that the trial court violated his due process rights by admitting co-conspirator statements despite hearsay objections. However, all of the admitted statements with which Davis takes issue were statements made in furtherance of a conspiracy, as defined by ER 801(d)(2)(v), or were adoptive admissions, pursuant to ER 801(d)(2)(ii), and were thus properly admitted as admissions of a party-opponent. Davis does not make a substantive argument as to why any of the statements admitted failed to conform to applicable hearsay exceptions.

Davis also advances several claims of prosecutorial misconduct. First, he argues that the prosecutor undercut a plea bargain that he had entered into by

---

[8] Davis's statement of additional grounds includes further claims of ineffective assistance of counsel. This assertion is rejected for the same reasons as his other claims of ineffective assistance. He shows neither deficient performance nor prejudice arising from his attorney's performance.

discussing unrelated criminal convictions at Davis's sentencing hearing. The plea bargain involved the imposition of consecutive sentences for the identity-theft conviction and an unrelated charge of promoting prostitution, to which Davis had entered a guilty plea. The prosecutor discussed Davis's criminal history as part of its explanation to the sentencing judge as to why the consecutive sentences, to which Davis had agreed, should be imposed. The prosecutor did not undercut the plea bargain.

Davis next argues that prosecutorial misconduct compromised his right to a fair trial and to a speedy trial. These assertions arise out of the State's addition of a charge of murder in the first degree in its third amended information, filed shortly before the original trial date. In response to the amendment, Davis's counsel moved for a continuance, which was granted. Subsequently, Davis moved to dismiss the murder charge, contending that the introduction of this charge in close proximity to the original trial date constituted misconduct that violated Davis's right to a fair trial. The State averred, in response, that the murder charge could not have been added until the State had reviewed sufficient evidence and that such review took a great deal of time due to the complex investigation and discovery process. The trial court denied Davis's motion to dismiss the charge.

Davis's speedy trial right cannot be said to have been violated by the addition of the murder charge; the State put forth a valid reason for filing the amended information when it did. There is nothing in the record to support his contention that the amendment was delayed in order to force him into requesting

a continuance. Similarly, the addition of the murder charge cannot be said to have denied Davis his right to a fair trial, given that the jury acquitted him of that charge and the charge of robbery in the first degree.

Davis next alleges perjury on the part of the prosecution's witnesses, particularly Ocean Wilson, to support an overall theory of malicious misconduct by the prosecution. The record does not support these claims. Davis claims that Wilson's perjury was indicated by camera footage that does not show Davis's car stopping at the time and place identified by Wilson when Davis dropped off Pry and Rodgers-Jones. However, testimonial evidence adduced at trial indicates that this was the result of the poor quality of the footage and does not show that Wilson's account was fabricated. Davis also makes sundry accusations of perjury against other state witnesses without any substantial support for his claims. As to all of these assertions, our purpose is not to reweigh the evidence. His claim that we should do so is unavailing.

Davis next asserts that his offender score of 22 was incorrectly calculated. During his sentencing hearing, he stated that he agreed with the trial court's calculation of his offender score. His assertion that it is incorrect is a new position taken without any explanation and without support in the record. His claim does not warrant appellate relief.

Davis also makes a vague assertion that the search warrant for his home and car was not valid, without providing any authority as to why this would be the case. Thus, he does not establish an entitlement to appellate relief.

Finally, Davis assigns error to the trial court's grant of the State's motion for joinder and to the trial court's subsequent denial of his motion to sever. Separate trials are not favored; a defendant seeking severance has the burden of demonstrating that a joint trial will result in a specific unfair prejudice that outweighs the policy of judicial economy that is served by joint trials. State v. Rodriguez, 163 Wn. App. 215, 228, 259 P.3d 1145 (2011). Davis's statement alleges no such unfair prejudice, or, in fact, any concern that would outweigh the public's interest in judicial economy in light of the trial's significant length, the nature of the charges, and the number of witnesses involved.

Nothing in Davis's statement of additional grounds establishes a basis for appellate relief.

### III

### Cruz Appeal

### A

Cruz's primary contention on appeal is that the amended information charging him with rendering criminal assistance in the first degree was constitutionally deficient because it failed to allege several essential elements of the crime. We agree.

Following Hood's death, Pry became concerned about secretly disposing of Hood's body. He asked Cruz for help. When law enforcement officers discovered Hood's body, they released Cruz's name to the press as someone being sought in connection with Hood's death.

Cruz subsequently surrendered himself to the police. He was charged by information with having committed both the felony of rendering criminal assistance in the first degree and the gross misdemeanor of concealing a deceased body. The amended information included the following language concerning the charge of rendering criminal assistance in the first degree:

### Count I
### Rendering Criminal Assistance in the First Degree [Non-Relative]

On or about or between December 17, 2015 and December 30, 2015, in the County of Kitsap, State of Washington, the above-named Defendant, rendered criminal assistance to a person who had committed or was being sought for any class A felony; contrary to the Revised Code of Washington 9A.76.070(1).[9]

Cruz contends that the information charging him with rendering criminal assistance in the first degree was constitutionally deficient. This is so, he asserts, because the information did not set forth all of the essential elements of the crime.

---

[9] In comparison, the to-convict jury instruction at trial for the charge of rendering criminal assistance in the first degree is more detailed and reads as follows:

To convict Arnold Cruz of the crime of Rendering Criminal Assistance in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
(1) That on or between December 17, 2015 and December 30, 2015, Arnold Cruz rendered criminal assistance to another person; and,
(2) That Arnold Cruz acted with the intent to prevent, hinder or delay the apprehension or prosecution of another person; and,
(3) That such other person had committed or was being sought for Murder in the First Degree; and,
(4) That Arnold Cruz knew that such other person had committed or was being sought for Murder; and,
(5) That the defendant's act occurred in the State of Washington.
If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
On the other hand, if, after weighing all the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

An accused has a right under both the state and federal constitutions to be informed of each criminal charge alleged so that the accused may adequately prepare a defense for trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22 (amend. X). The State must provide a charging document that sets forth every material element of each charge made, along with essential supporting facts. State v. McCarty, 140 Wn.2d 420, 425, 998 P.2d 296 (2000).

"The standard of review for evaluating the sufficiency of a charging document is determined by the time at which the motion challenging its sufficiency is made." State v. Taylor, 140 Wn.2d 229, 237, 996 P.2d 571 (2000). When a defendant challenges the sufficiency of the charging document prior to a verdict, the charging language is strictly construed. Taylor, 140 Wn.2d at 237. If, however, the defendant challenges the sufficiency of the charging document following a verdict, then the charging language must be construed liberally in favor of validity. Taylor, 140 Wn.2d at 237.

Because a challenge to the sufficiency of a charging document involves a question of constitutional due process, it may be raised for the first time on appeal. State v. Leach, 113 Wn.2d 679, 691, 782 P.2d 552 (1989). When an appellant raises such a challenge, the proper standard of review is the two-pronged test set forth in State v. Kjorsvik, 117 Wn.2d 93, 106, 812 P.2d 86 (1991): "The standard of review we here adopt will require at least some language in the information giving notice of the allegedly missing element(s) *and* if the language is vague, an inquiry may be required into whether there was actual prejudice to the defendant."

A charging document satisfies the first prong of this test by setting forth all of the essential elements of the crime charged. McCarty, 140 Wn.2d at 425. If the required elements are set forth, even if only in vague terms, then the charging document satisfies the second prong of the test if the terms used did not result in any actual prejudice to the defendant. McCarty, 140 Wn.2d at 425. However, if the required elements cannot be found, or even fairly implied, in the charging document, we do not reach the second prong of the test. Instead, when the charging document fails the first prong of the test, prejudice to the defendant is presumed and we must declare the charging document constitutionally deficient. McCarty, 140 Wn.2d at 425. The remedy for a constitutionally deficient charging document is reversal and dismissal of the charge without prejudice to the State's ability to refile the charge. State v. Quismundo, 164 Wn.2d 499, 504, 192 P.3d 342 (2008).

Here, Cruz asserts that the information charging him with rendering criminal assistance in the first degree omitted essential elements of the crime set forth in RCW 9A.76.050. The State responds by asserting that RCW 9A.76.050 merely provides a definition for an element of the crime of "rendering criminal assistance in the first degree" as set forth in RCW 9A.76.070, and that such definitional terms need not be alleged. Because Cruz raises his challenge for the first time on appeal, we apply the standard of review announced in Kjorsvik. Hence, to properly resolve the claim of error, we must first identify the essential elements of the crime of rendering criminal assistance in the first degree.

RCW 9A.76.070(1) provides that, "[a] person is guilty of rendering criminal assistance in the first degree if he or she renders criminal assistance to a person who has committed or is being sought for murder in the first degree or any class A felony or equivalent juvenile offense." The base crime of "rendering criminal assistance" is set forth in RCW 9A.76.050:

> As used in RCW 9A.76.070, 9A.76.080, and 9A.76.090, a person "renders criminal assistance" if, with intent to prevent, hinder, or delay the apprehension or prosecution of another person who he or she knows has committed a crime or juvenile offense or is being sought by law enforcement officials for the commission of a crime or juvenile offense or has escaped from a detention facility, he or she:
> (1) Harbors or conceals such person; or
> (2) Warns such person of impending discovery or apprehension; or
> (3) Provides such person with money, transportation, disguise, or other means of avoiding discovery or apprehension; or
> (4) Prevents or obstructs, by use of force, deception, or threat, anyone from performing an act that might aid in the discovery or apprehension of such person; or
> (5) Conceals, alters, or destroys any physical evidence that might aid in the discovery or apprehension of such person; or
> (6) Provides such person with a weapon.

Six years ago, our Supreme Court was called upon to resolve a sufficiency of the evidence challenge to a conviction for rendering criminal assistance in the first degree. State v. Budik, 173 Wn.2d 727, 272 P.3d 816 (2012). To resolve the challenge, the court was required to identify the essential elements of the offense. Budik, 173 Wn.2d at 733 ("the question is whether, viewing the evidence in the light most favorable to the State, 'any rational fact finder *could have found the essential elements of the crime* beyond a reasonable doubt'" (emphasis added) (quoting State v. Engel, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009))). The court did so, stating that a person violates RCW 9A.76.070

if (1) "he or she renders criminal assistance" (2) to another person "who has committed or is being sought for murder in the first degree or any class A felony or equivalent juvenile offense.". . .

. . . .

[A] person renders criminal assistance if he or she (1) knows that another person (a) "has committed a crime or juvenile offense" or (b) "is being sought by law enforcement officials for the commission of a crime or juvenile offense" or (c) "has escaped from a detention facility" and (2) intends "to prevent, hinder, or delay the apprehension or prosecution" of that other person and (3) undertakes one of the six specified actions [set forth in RCW 9A.76.050].

Budik, 173 Wn.2d at 734. The court found that the evidence was insufficient to support a finding that Budik had undertaken one of the six specified actions set forth in RCW 9A.76.050. Budik, 173 Wn.2d at 737-38. Therefore, the court concluded, no rational fact finder could have found all of the essential elements of the crime of rendering criminal assistance in the first degree proved beyond a reasonable doubt. Budik, 173 Wn.2d at 737-38.[10]

Although we are here considering the sufficiency of an information, rather than the sufficiency of the evidence supporting a conviction, the essential elements identified in Budik control. Indeed, it was incumbent upon our Supreme Court to set forth the essential elements of the crime of rendering criminal assistance in the first degree *before* it could analyze whether the evidence sufficiently supported a finding that all of those elements had been proved beyond a reasonable doubt. See Budik, 173 Wn.2d at 733. Therefore, the Budik decision unquestionably identified the essential elements of the crime of

---

[10] We have previously followed Budik, relying on its identification of the essential elements of the crime of rendering criminal assistance in the first degree, in resolving a similar sufficiency of the evidence challenge to a conviction for rendering criminal assistance in the first degree. State v. Mollet, 181 Wn. App. 701, 706-08, 326 P.3d 851 (2014).

rendering criminal assistance in the first degree. That the essential elements must be delineated herein, so as to evaluate the content of the charging document, as opposed to the sufficiency of the evidence adduced at trial, is of no moment.

The amended information charging Cruz with rendering criminal assistance in the first degree did not include all of the essential elements of the crime, as identified in Budik. In fact, it did not set forth *any* of the elements of the base crime of rendering criminal assistance set forth by RCW 9A.76.050. Because the amended information entirely omitted references to such elements and was devoid of any language from which those elements could be fairly implied, the information fails the first prong of the Kjorsvik test. As a result, we presume prejudice to Cruz and need not consider the second prong of the test.[11]

For its part, the State contends that RCW 9A.76.070 sets forth the crime of rendering criminal assistance in the first degree and that RCW 9A.76.050 sets forth merely the definition of an element of that crime, i.e., what it means to render criminal assistance. The State further asserts that this definition of rendering criminal assistance, as set forth in RCW 9A.76.050, did not need to be included in the amended information. These contentions are unavailing. Given that this argument directly conflicts with our Supreme Court's holding in Budik, wherein the court identified the essential elements of the crime as including the

---

[11] The State contends that other circumstances in the charging process, specifically a detailed probable cause statement provided to Cruz with the original information, sufficiently informed Cruz of the charges against him so as to bar any claim that he was prejudiced by the information. Because we do not reach the second prong of the Kjorsvik test, we need not consider this argument. When the charging document fails the first prong of the Kjorsvik test, prejudice is presumed.

elements of the base crime of rendering criminal assistance set forth in RCW 9A.76.050, the State's arguments fail.

In support of its contentions, the State cites to State v. Johnson, 180 Wn.2d 295, 325 P.3d 135 (2014), and State v. Porter, 186 Wn.2d 85, 375 P.3d 664 (2016). Neither of these cases supports the State's assertion that Budik did not declare that the essential elements of rendering criminal assistance in the first degree include the elements set forth in RCW 9A.76.050.[12] Indeed, the State misinterprets the cases cited. This misperception stems from a fundamental misapprehension of a basic principle: there is a difference between an instruction that states what the essential elements of a crime *are*, as opposed to an instruction that states what an essential element *means*.

In Johnson, the defendant was charged with unlawful imprisonment. The information stated that "the defendant J.C. JOHNSON in King County, Washington, during a period of time intervening between May 4, 2009 through May 6, 2009, did knowingly restrain [J.J.], a human being." 180 Wn.2d at 301. Johnson challenged the sufficiency of the information because it did not include the definition of "restrain," as set forth in former RCW 9A.40.010(1) (1975). Johnson, 180 Wn.2d at 301-02. Our Supreme Court rejected Johnson's

---

[12] The State asserts that Porter distinguished between the requirements of jury instructions and the requirements of charging documents. Therefore, the State reasons, Budik's determination of the essential elements does not apply here, as it reviewed the sufficiency of evidence posttrial. Such a conclusion is a misreading of Porter, which simply stated that not "all aspects of proof that are necessary at trial constitute essential elements that must be included in the information." Porter, 186 Wn.2d at 94. Porter did not upset clear precedent requiring that all *essential elements of any crime charged be included in a charging document.*

argument, holding that the State was not required to include the definition of the element of "restrain." Johnson, 180 Wn.2d at 301-02.

Similarly, in Porter, the court deemed sufficient an information charging the defendant with unlawful possession of a stolen vehicle that did not include the definition of the word "possess." 186 Wn.2d at 91. The information in question alleged that "CLIFFORD MELVIN PORTER, JR., in the State of Washington, on or about the 27th day of August, 2011, did unlawfully and feloniously knowingly possess a stolen motor vehicle, knowing that it had been stolen." Porter, 186 Wn.2d at 88. Porter argued that the information should have included the definition of possess, as set forth in RCW 9A.56.140(1), as an essential element. Porter, 186 Wn.2d at 88. The court disagreed, holding that RCW 9A.56.140(1) merely defined the essential element of possession, rather than providing an additional element that the State must charge. Porter, 186 Wn.2d at 91.

Neither Johnson nor Porter overrule the holding in Budik that RCW 9A.76.050 sets forth some of the essential elements of the crime of rendering criminal assistance in the first degree.[13] Both Johnson and Porter support the proposition that provisions of definitional statutes that explain what an essential element of a crime *means* may be excluded from an information, but that provisions of definitional statutes that explain what the essential elements of a

---

[13] Additionally, Johnson and Porter can be further distinguished from the circumstances herein because the charging documents analyzed in both cases included essential mens rea elements that are absent in the amended information charging Cruz. In fact, the court in Porter specifically distinguished its holding from that of another case, State v. Moavenzadeh, 135 Wn.2d 359, 956 P.2d 1097 (1998), wherein the charging document was found to be insufficient because it did not include all essential mens rea elements.

crime *are* must be included. Because the court in <u>Budik</u> specifically set forth the provisions of RCW 9A.76.050 as essential elements of the crime of rendering criminal assistance in the first degree, the State cannot be correct that section .050 merely explains the meaning of an essential element of the crime.

The amended information charging Cruz with rendering criminal assistance in the first degree did not set forth all of the essential elements of the crime, as declared by our Supreme Court. Therefore, the information fails the first prong of the <u>Kjorsvik</u> test, was prejudicial to Cruz, and was thereby constitutionally deficient. Accordingly, Cruz's conviction of rendering criminal assistance in the first degree must be reversed and the cause remanded to the trial court for dismissal of the charge without prejudice.

### B

Because we hold that the amended information was constitutionally deficient, we need not reach Cruz's contention regarding his exceptional sentence. The reversal of the conviction for rendering criminal assistance in the first degree renders the sentencing issue moot. We thus proceed to Cruz's statement of additional grounds.

### C

In his statement of additional grounds for review, filed pursuant to RAP 10.10, Cruz personally asserts several additional claims.

Cruz first asserts that his offender score was incorrectly calculated. Because we reverse the conviction for rendering criminal assistance in the first degree, this issue, like the exceptional sentencing issue, is moot.

It is somewhat difficult to determine what Cruz asserts as his second additional ground. Without presenting any argument that his convictions violated the double jeopardy clause of the Fifth Amendment to the United States Constitution, Cruz cites to case law interpreting the clause. He does not actually assert that any particular conviction or charges violated the double jeopardy clause, and it is apparent that his convictions do not, in fact, run afoul of the constitutional prohibition. He has not established a basis for appellate relief.

Cruz next asserts a claim of prosecutorial misconduct, premised on an assertion of improper statements made by the prosecutor during trial. To resolve such a claim, we first inquire whether the prosecutor made improper comments, then, if such comments were made, we inquire as to whether they were prejudicial to the defendant. State v. Lindsay, 180 Wn.2d 423, 431, 326 P.3d 125 (2014). "If the defendant did not object at trial, the defendant is deemed to have waived any error, unless . . . the defendant show[s] that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" Emery, 174 Wn.2d at 760-61 (quoting Thorgerson, 172 Wn.2d at 455).

Here, Cruz's contention of prosecutorial misconduct fails because none of the statements he avers to be misconduct actually constitute misconduct. Furthermore, Cruz failed to object to any of the statements at trial, and does not assert that any misconduct could not have been cured by an instruction to the jury. Instead, Cruz asserts that the evidence referenced by the prosecutor was

"phony." But Cruz's disdain for the evidence does not establish that the prosecutor engaged in misconduct by referencing such evidence during closing argument. Cruz's assertion of prosecutorial misconduct fails.

Nothing in Cruz's statement of additional grounds establishes a basis for appellate relief.

## IV

The judgment entered in State v. Pry is affirmed.

The judgment entered in State v. Davis is affirmed.

Cruz's conviction of rendering criminal assistance in the first degree is reversed and the cause is remanded to the trial court with direction to dismiss the charge without prejudice. Cruz's other convictions remain undisturbed. State v. Cruz is remanded to the trial court for resentencing.

We concur: